## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 19 B 15935 |
| | ) | Chapter 11 |
| LOUIS JOHN CAPRA, | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |

### MEMORANDUM OPINION

Once cause to dismiss or convert a case under 11 U.S.C. § 1112(b) has been established, the Court's choice between these two remedies must be based on its determination of which remedy "is in the best interests of creditors and the estate." But when the major creditors are sharply divided on which remedy is more appropriate, what additional factors should the Court consider? Here, the Court concludes that its mandate to protect the "best interests of the estate" includes protection of the bankruptcy process itself. The Court further concludes that its mandate to protect the "best interests of creditors" includes ensuring that all creditors within a particular class are treated equally. For the reasons below, consideration of these two factors leads the Court to conclude that conversion is preferable to dismissal.

### JURISDICTION

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 1334(a). This matter is a core proceeding in which the Court may enter a final order under 28 U.S.C. § 157 (b)(2)(A) because it is a matter concerning the administration of a bankruptcy estate.

### FACTS AND BACKGROUND

The relevant facts are undisputed. All parties, including the Debtor, agree that ample cause

exists under § 1112(b) to either dismiss or convert this case.[1] The parties disagree, however, about which of these remedies better serves the interests of the creditors and the estate. The Debtor and two creditors support dismissal of his case, while the United States Trustee (the "UST") and two other creditors support conversion.

The Debtor, representing himself, filed his Chapter 11 case on June 4, 2019. (Dkt. No. 1.) He did so because he mistakenly believed that his bankruptcy filing would automatically lead to the removal of a state-court receiver who had been appointed over one of his properties during litigation with McCormick 106 LLC, one of his creditors in these bankruptcy proceedings. (Hearing Transcript p. 17, line 20 through p. 18, line 1.) As discussed below, the Debtor then repeatedly filed inaccurate, incomplete, and sometimes contradictory schedules and forms with the Court, sold two of his luxury automobiles without Court authorization or notice to creditors, failed to put the proceeds from one of those sales in his debtor-in-possession account, and misstated the number of creditors and the nature of their claims.

<u>The Debtor Repeatedly Filed Incomplete and Inaccurate Schedules</u>

The Debtor filed the first version of his Schedules on June 30, 2019 (the "First Schedules"), after he had retained a bankruptcy attorney. (Dkt. No. 39.) These Schedules contained many significant errors:

1. The Debtor swore that he owned only two parcels of real estate: a single-family home in Bartlett, Illinois valued at $437,500 and property on Creekview Road in Rockford, Illinois valued at $1,750,000. (*Id.*, Schedule A/B.) As discussed below, this list was significantly incomplete.

2. The Debtor also said that he only owned three vehicles: (i) a 2007 Ferrari valued at $100,000 (the "Ferrari"); (ii) a 2006 Bentley valued at $30,000 (the "Bentley"); and

---

[1] The facts described are mainly drawn from the UST's motion to dismiss or convert the case (Dkt. No. 128) and supplemented by materials from the docket in this case. The Court held a hearing on the UST's motion to convert or dismiss on December 10, 2019. No party requested an evidentiary hearing and all the relevant facts are before the Court. *See In re Aurora Memory Care, LLC*, 589 B.R. 631, 634 (Bankr. N.D. Ill. 2018) (citing *In re Bartle*, 560 F.3d 724, 729 (7th Cir. 2009)).

(iii) a 2015 Honda Accord valued at $10,000 (*Id.*) This listing was also seriously incomplete.

3. The Debtor listed $2,500 worth of miscellaneous jewelry. (*Id.*) The jewelry turned out to be worth nearly ten times that amount. (*See* Dkt. No. 115.)

4. Finally, in the First Schedule G, the Debtor said he was not a party to any unexpired leases or executory contracts. (Dkt. No. 39, Schedule G.) That was not true. (*See* Dkt. No. 115.)

On September 19, 2019, the Debtor tried again, filing substantial amendments to his First Schedules (the "Second Schedules"). (Dkt. No. 98). The Second Schedules added several significant property interests that he had failed to include in the First Schedules, including real estate in Loves Park, Illinois valued at $100,000; a Rolls Royce valued at $77,450; and $4,375 worth of previously undisclosed firearms. (*Id.*, Schedule A/B.) The Debtor also admitted that the true value of his miscellaneous jewelry was $24,870, not the $2,500 he had stated in his First Schedules. (*Id.*) These changes resulted in an increase of $204,195 in the value of his property. (*Id.*)

But the Debtor was not yet done. On October 10, 2019, he again significantly amended his schedules (the "Third Schedules"). (Dkt. No. 115.) This time, the Debtor listed ownership interests in four additional parcels of property worth a combined $2,605,000.[2] (*Id.*, Schedule A/B.)

### The Debtor Sold Property Without the Court's Permission After Filing

But failing to accurately and completely list his assets was not the worst of the Debtor's bankruptcy sins. On September 11, 2019, the Debtor revealed at the creditors' meeting that he had sold two luxury vehicles for over $100,000 after he filed bankruptcy but without the Court's authorization or prior knowledge. (Dkt. No. 28, ¶ 9.) The Debtor sold his Rolls Royce, property

---

[2] The newly disclosed properties are 810 Morse, Schaumburg, Illinois, valued at $725,000; 1603-1617 Overdene Avenue, Rockford, Illinois, valued at $865,000; 3319-3327 Sun Valley Terrace, Rockford, Illinois, valued at $700,000; and 2512 North Rockton Avenue, Rockford, Illinois, valued at $315,000. The total value of those properties is $2,605,000.

3

which he had not even listed as an asset in the First Schedules, for $75,000 just six days after he filed this case. (*Id.*) Compounding his error, the Debtor did not deposit the proceeds into his Chapter 11 debtor-in-possession account. (*Id.*) Instead, he deposited them into a bank account associated with one of his limited liability corporations. (*Id.*)

At the same creditors' meeting, the Debtor further revealed that he sold his Bentley for $29,000 in August 2019, again without informing the Court or obtaining its authorization. (*Id*; Dkt. No. 97, pp. 5-6.) Fortunately, this time he deposited the sales proceeds into his debtor-in-possession account. (*Id.*)

On September 19, 2019, counsel for the Debtor, recognizing the severity of these transgressions, filed a motion asking the Court to authorize the sales of both the Rolls Royce and the Bentley, *nunc pro tunc*. (Dkt. No. 97.) The Court denied that motion. (Dkt. No. 170.)

<u>The Debtor Misstated the Number of Unsecured Creditors and Their Claim Amounts</u>

As serious as these transgressions were, they do not complete the picture. The Debtor submitted another materially incomplete form when he filed his Official Form 104 as part of the initial bankruptcy filing. (Dkt. No. 1.) Official Form 104 requires debtors to list their twenty largest unsecured creditors and file that list with the bankruptcy petition. (*See* Fed. R. Bankr. P. 1007(d)). In Form 104, the Debtor listed only four unsecured creditors whose claims combined for $6,011,516.05.[3] (Dkt. No. 1, pp. 9 & 10.) By the time the Debtor filed his First Schedules, however, he more than tripled this list, stating that he owed twenty debts to fourteen different

---

[3] The Debtor listed unsecured claims to Amita Health for $5,610; Annie Leggett for $6,000,000; Cardiovascular Associates for $1,200; and Szabo Associates for $4,706.05.

4

unsecured creditors, whose claims total $16,147,448 – a $10,135,932 increase from his first Official Form 104.[4] (Dkt. No. 39, Schedule E/F.)

### The Debtor Repeatedly Filed Inaccurate and Incomplete Statements of Financial Affairs

There was more. The Debtor has also filed six separate statements of financial affairs ("SOFAs") since he filed this case. All debtors who file for bankruptcy must complete a SOFA, or Official Form 107, and they must declare, under penalty of perjury, that all the answers given in the SOFA are true and correct. The Debtor signed each of the six SOFAs he filed, saying that, under penalty of perjury, he had answered all the questions truthfully and correctly. (Dkt. Nos. 1, 39, 98, 102, 117, 164.) As discussed below, that oath cannot possibly be true because each of the six SOFAs conflicts with the others in material ways.

Part 3 of Official Form 107 asks debtors whether their debts are primarily consumer debts and asks if they have paid any creditors during the 90 days before their bankruptcy filing.[5] In the Debtor's first SOFA, in Part 3, he said that his debts *are not* primarily consumer debts and that he paid three creditors a combined $200,212.38 in the 90 days before he filed for bankruptcy.[6] (Dkt. No. 1.) But when he filed his second SOFA, he retracted this admission, now stating that he had not paid any creditors in the 90 days before he filed for bankruptcy. (Dkt. No. 39.) Then, when he filed his third and fourth SOFAs, he changed his answer about the nature of his debts, now

---

[4] The Debtor filed his First Schedules on June 30, 2019, 26 days after he filed for bankruptcy. Besides the unsecured claims he listed in his first Official Form 104, he added the following unsecured creditors: Baxter Credit Union for $29,230.49; First Midwest Bank for $724,721.05; Greystone Servicing for $1,984,589.69; Hunt Servicing for $2,763,216.62; McCormick 106 LLC for $2,105,499.38; Midwest Community Bank for $2,525,679.14; Health Care Revenue Recovery Group for $1,109; NICOR for $561.48; Rock River Water Reclamation for $833.52; and the City of Rockford for $491.63. Those unsecured claims total $10,135,932. When combined with the four other unsecured claims the Debtor listed in his first Official Form 104, the total amount equals $16,147,448.

[5] If the debts are not consumer debts, debtors must only disclose payments to creditors of more than $6,825. For consumer debts, debtors must disclose payments to creditors of more than $600.

[6] The Debtor stated he paid Hunt Real Estate LLC $55,740.21; Greystone Servicing $51,654; and Midwest Community Bank $92,818.17 all on April 1, 2019.

5

saying that his debts *are* primarily consumer debts. (Dkt. Nos. 98 & 102.) But these alterations were short-lived, because the Debtor changed his answers in Part 3 yet again in his fifth SOFA, now saying that his debts *are not* primarily consumer debts and that he had not just paid *three* creditors in the 90 days before filing for bankruptcy, he had paid *six*. (Dkt. No. 117.)

But that admission was still materially false. The Debtor attached an exhibit to his fifth SOFA that listed the creditors he paid, the payment amounts, and the dates he made the payments. (*Id.*, Ex. A.) In total, the Debtor listed $209,088.42 in payments to six creditors in the 90 days before he filed for bankruptcy in the attached exhibit.[7] (*Id.*) But the list failed to include the Debtor's $51,654 payment to Greystone Servicing or the $92,818.17 payment to Midwest Community Bank on April 1, 2019, even though the Debtor included those payments in his first SOFA. (Dkt. No. 1.) The Debtor's answers in Part 3 are the same in his sixth SOFA as those in his fifth, with the same exhibit attached. (Dkt. No. 164.)

The list of misrepresentations goes on. Part 9 of Official Form 107 asks debtors if they hold or control property for someone else and, if so, to describe it. In the Debtor's first five SOFAs, he answered that question "No." (Dkt. Nos. 1, 39, 98, 102, 117.) The Debtor changed his answer to "Yes" in his sixth SOFA, which the Debtor submitted on December 9, 2019 — over six months after he filed for bankruptcy. (Dkt. No. 164.) He listed 21 security deposits he holds for various tenants in rental properties he owns with the value for each of them listed as "unknown." (*Id.*)

The Debtor also failed to list all the limited liability companies in which he is a member. Part 11 of Official Form 107 asks debtors whether, in the four years before their filing for bankruptcy, they have certain business interests, including membership in a limited liability

---

[7] The Debtor listed that he paid these creditors during the 90-day period before he filed for bankruptcy: First Midwest Bank, $18,363; Hunt Real Estate, $55,740.21; IPFS Corp., $21,313.06; Midwest Bank of Freeport, $66,187; Paypal, $25,773.55; Rock River Water Reclamation District, $21,711.60. These amounts total $209,088.42.

6

company. In his first SOFA, the Debtor listed that he is a member in *one* limited liability company, Louis Capra & Associates LLC. (Dkt. No. 1.) In the Debtor's second SOFA, however, he listed that he is a member in *six* different limited liability companies. (Dkt. No. 39.)

Part 11 also asks debtors whether they gave a financial statement to anyone about a business during the two years before their bankruptcy filing. It asks debtors to include all financial institutions, creditors, or other parties. In the Debtor's first SOFA, he stated that he provided a financial statement only to Midwest Community Bank on March 22, 2019. (Dkt. No. 1.) But in the next five SOFAs the Debtor filed, he does not list Midwest Community Bank as a party to which he provided a financial statement. (Dkt. Nos. 39, 98, 102, 117, 164.) Instead, the Debtor listed only that he provided a financial statement to First Secure Bank in October 2018 in those next five SOFAs. (*Id.*)

Other inconsistencies in the Debtor's six SOFAs include his answers in Part 4 about whether any of the Debtor's creditors had foreclosed on his property in the year before his bankruptcy case. In his first SOFA, he did not answer either "Yes" or "No." (Dkt. No. 1.) In his next five SOFAs, however, he answered "Yes" and listed McCormick 106 LLC. (Dkt. Nos. 39, 98, 102, 117, 164.) Part 4 also asks whether any of the Debtor's property was in the possession of a court-appointed receiver in the year before his bankruptcy filing. The Debtor answered "No" in his first SOFA, but he answered "Yes" in his next five SOFAs. (*See* Dkt. Nos. 1, 39, 98, 102, 117, 164.)

### The UST's Motion to Dismiss or Convert

Eventually, after the Debtor had filed three separates sets of schedules, sold two luxury vehicles without the Court's permission, and submitted five inconsistent and inaccurate SOFAs, the UST moved to either dismiss the Debtor's case or convert it to Chapter 7. (Dkt. No. 128.)

7

Besides noting the Debtor's various inaccurate and incomplete financial disclosures, the UST informed the Court that the Debtor's monthly operating reports were missing certain pages and that one of the reports was inaccurate. (*Id.*, p. 8.) The UST did not, however, state in the motion whether he supported dismissal or conversion. (*Id.*)

One creditor, McCormick 106 LLC, filed a response arguing for conversion of the case rather than dismissal. (Dkt. No. 137.) By contrast, two of the Debtor's lenders argued for dismissal rather than conversion. Midwest Community Bank filed a response stating it agrees that cause exists to convert or dismiss the Debtor's case, but that it supports dismissal rather than conversion because dismissal is in the best interests of the creditors and the estate. (Dkt. No. 132.) First Midwest Bank joined in this response. (Dkt. No. 155.) The Debtor conceded that cause exists to dismiss or convert his case to Chapter 7, but argued that dismissal, rather than conversion, would better serve the interests of the estate and the creditors. (Dkt. No. 162.)

### The Court's Hearing on the UST's Motion to Dismiss or Convert

On December 10, 2019, the Court held a hearing on the UST's motion to either dismiss the case or convert it. At that hearing, the UST stated that he supports conversion of the Debtor's case to Chapter 7. (Hearing Transcript, p. 9, line 20 through p.10, line 15.) He based this preference on the fact that conversion would enable a trustee to further examine the Debtor's conduct and to investigate whether the Debtor made avoidable conveyances that he or she could unwind for the benefit of the Debtor's creditors.

The Debtor's creditors were sharply divided on the convert-or-dismiss issue. Midwest Community Bank and First Midwest Bank repeated their written arguments supporting dismissal. They emphasized to the Court that they made that choice because the Debtor was continuing to

pay his debts to them, and they were both satisfied with their relationships with the Debtor. (*Id.* at p. 22, line 18 through p. 23, line 11; p. 25, lines 7-11.)

By contrast, McCormick 106 LLC, the creditor in litigation with the Debtor who had successfully moved for appointment of the state-court receiver, strongly supported conversion. Alarmed by the Debtor's wildly fluctuating schedules and his unauthorized sales of the estate's property, McCormick was gravely concerned that, if the case were to be dismissed, the Debtor would be free to secrete or otherwise dispose of his assets before McCormick could obtain a judgment against him in state court. (*Id.* at p. 21, lines 2-12.) McCormick also noted that the trustee in a converted Chapter 7 case could investigate and unwind any avoidable transfers made by the Debtor before or after his bankruptcy filing. (*Id.* at p. 21, line 21 through p. 22, line 7.)

Annie Leggett, one of the Debtor's unsecured creditors who did not respond to the UST's motion, appeared through counsel and supported converting the Debtor's case. (*Id.* at p. 25, lines 17-21.) Baxter Credit Union, another of the Debtor's creditors, appeared and informed the Court that it had no position on conversion or dismissal. (*Id.* at p. 26, lines 8-14.)

Finally, and unsurprisingly, the Debtor also appeared and argued for dismissal. (*Id.* at p. 20, lines 4-7.) The Court then ended the hearing and took the matter under advisement.

## DISCUSSION

Because all the parties, including the Debtor, agree that cause exists under § 1112(b)(1) to convert or dismiss, the sole issue here is to determine which of those two options is in the best interests of the creditors and the estate.[8]

---

[8] Once cause is established under § 1112(b), a court must either dismiss the case or convert it to Chapter 7. *See Aurora Memory Care*, 589 B.R. at 637.

9

### The Factors Normally Considered in Determining Which Remedy is in the Best Interests of Creditors and the Estate

The phrase "best interests of creditors and the estate" is not defined in the Bankruptcy Code. *See* 11 U.S.C. § 1112(b); 7 Richard Levin & Henry J. Sommer, COLLIER ON BANKRUPTCY ¶ 1112.04[7] (16th ed). Bankruptcy courts have broad discretion in deciding whether to convert or dismiss a case. *Northbrook Loans, LLC v. BlackAMG*, 555 B.R. 680, 682 (N.D. Ill. 2015). In many cases, courts find that creditors are typically "'best served by the course of action that results in the largest number of [them] being paid the largest amount of money in the shortest amount of time.'" *Aurora Memory Care*, 589 B.R. at 643 (quoting *In re Rey*, Nos. 04 B 22548, 06 B 4487, 2006 WL 2457435, at *8 (Bankr. N.D. Ill. Aug. 21, 2006)). Courts also "compare how creditors fare inside, as opposed to outside, bankruptcy." *In re Green Box NA Green Bay, LLC*, 579 B.R. 504, 511 (Bankr. E.D. Wis. 2017). Some courts consider the interests of all creditors and do not merely "yield[] to the majority interest." *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 243 (4th Cir. 1994); *see also Shulkin Hutton, Inc. v. P.S.V. Treiger (In re Owens)*, 552 F.3d 958, 961 (9th Cir. 2009). But the "key question . . . is 'what assets would be available for a chapter 7 trustee to liquidate and administer for the benefit of unsecured creditors if this case were converted?'" *Aurora Memory Care*, 589 B.R. at 643 (quoting *Green Box*, 579 B.R. at 511).

The Debtor and those creditors who support dismissal first argue that conversion is not in the best interests of the creditors because converting the case would add trustee administrative expenses that would deplete the assets of the estate. In addition, First Midwest Bank and Midwest Community Bank argue for dismissal out of self-interest: They both have long-standing business relationships with the Debtor, and they are both confident the Debtor would continue to make timely payments to them if the case were dismissed. However, neither of them supported their

positions with any analysis showing that creditors in general (as opposed to these two particular creditors) would fare better if the Court were to dismiss the Debtor's case rather than convert it.

Those arguments for dismissal are understandable but unpersuasive. The arguments are understandable because those two creditors are being treated favorably by the Debtor and can reasonably expect to keep receiving favorable treatment if the case is dismissed. Their arguments are unpersuasive because they do not adequately consider the interests of all creditors. In determining which remedy is more appropriate, the Court should consider the interests of *all* the Debtor's creditors, not just those who expect to receive favorable treatment from the Debtor. *See Superior Siding & Window*, 14 F.3d at 243.

It is true that the Debtor has assured the Court that he fully intends to pay all his creditors. (Dkt. No. 162, p. 5 ¶ 25; Hearing Transcript p.11, lines 8-10.) But given the Debtor's misconduct in this case and his current financial situation, the Court gives little credence to this promise. The Debtor lists his current net monthly income as $795.80. (Dkt. No. 39, Schedule J.) He owes his unsecured creditors $16,120,239.99. (Dkt. No. 115, Schedule E/F.) Even if the Court were to ignore the Debtor's conduct in this case and credit his intent to repay all his creditors in full outside bankruptcy, the gross disparity between his income and his debts makes his promise of repayment in full to all creditors incredible.

While conversion would not ensure full repayment of all the Debtor's creditors, it would at least ensure their fair and equal treatment in receiving their shares of the Debtor's disposable assets. The fears expressed by First Midwest Bank and Midwest Community Bank that the administrative expenses of a Chapter 7 trustee would consume all the Debtor's available assets appear to be overblown. Even before taking into account a trustee's presumed recovery of

proceeds from avoidable conveyances, there appear to be significant assets available to pay unsecured creditors in this case.

Midwest Community Bank's proof of claim lists the value of its secured claim at $1,824,384.54, but the value of the secured collateral at $2,375,000,[9] leaving $550,615.46 available for distribution to unsecured creditors and payment of trustee fees from these assets alone. The Debtor also has an unencumbered Ferrari he valued at $100,000, and the proceeds from the sale of that asset would be available for distribution to the unsecured creditors. (Dkt. No. 115, Schedule A/B.)

Finally, one must also add a trustee's possible recovery from preference and fraudulent conveyance actions. The Debtor's SOFAs show he made $353,560.59 in total payments[10] to creditors during the 90-day preference period before filing for bankruptcy, which a Chapter 7 trustee could seek to unwind as improper preferences. (Dkt. Nos. 1, 117, 164.) The trustee may, of course, uncover even more avoidable conveyances when he begins his investigation.

In the Court's estimation, therefore, there is little risk that trustee fees would eat up most of the funds available for distribution to unsecured creditors. Instead, conversion and appointment of a trustee would likely increase the assets available for distribution and ensure that those funds

---

[9] Midwest Community Bank's proof of claim does not appear in the Docket, but rather in the Claims Registry. Midwest Community Bank's claim is No. 8 on the Claims Registry, and the information about the value of the secured claim and the value of the collateral are found on Main Document, page 2. The claim refers to the following properties listed on the Debtor's Third Schedules (Dkt. No. 115, Schedule A/B): 1812 Riverside, Loves Park, IL 61111; 2512 North Rockton Avenue, Rockford, IL 61103; 3319-3327 Sun Valley Terrace, Rockford, IL 61103; and 1603-1617 Overdene Avenue, Rockford, IL 61103.

[10] In the Debtor's First SOFA, he listed making the following payments during the 90-day preference period: Hunt Real Estate LLC for $55,740,21; Greystone Servicing for $51,654; and Midwest Community Bank for $92,818.17. (Dkt. No. 1.) In the Debtor's Fifth and Sixth SOFAs, he attached an exhibit that includes these payments which he did not list in his First SOFA: First Midwest Bank, $18,363; IPFS, $21,313.06; Midwest Bank of Freeport, $66,187; Paypal, $25,773.55; Rock River Water Reclamation District, $21,711.60. All these payments total $353,560.59.

are fairly and equitably distributed among the creditors. "When there are estate assets with equity, conversion is the better course." *In re Delta AG Grp.*, 596 B.R. 186, 201 (Bankr. W.D. La. 2019).

<u>Additional Factors This Court Considered In Its Decision to Convert the Debtor's Case</u>

But § 1112(b) does not limit the Court's analysis to determining the best interests of creditors. The Court is also instructed to consider the best interests of the estate. The Court is of the view that protecting the best interests of the estate includes protecting the bankruptcy process under which the estate is administered. The two creditors who favor dismissal ignore the unfortunate consequences upon the estate and the bankruptcy process that would likely ensue from dismissal. If the Court were to permit a debtor who has systematically abused the bankruptcy process to walk away from all consequences of that misconduct, the Court should expect that other debtors will take note and conclude that filing false schedules and selling the estate property without court authorization is a risk-free alternative to obeying the rules.

Here, the Debtor's misconduct was especially egregious. Because the Debtor repeatedly filed incomplete and inaccurate Schedules and SOFAs, he made it impossible for creditors, the UST, and the Court to get an accurate picture of his financial condition. This, in turn, makes it nearly impossible to evaluate potential avoidable conveyances, to evaluate a plan of reorganization, or to otherwise oversee the bankruptcy case as it should be. Even worse, when a debtor sells valuable property of the estate with no notice to creditors and no authorization from the Court, he forecloses creditors, the UST, and the Court from exercising their respective oversight roles. When a debtor commits both types of misconduct in the same case, the risk that a dishonest debtor could loot the estate of its assets increases greatly.

For a court to allow a debtor to engage in such misconduct without consequence will only invite more of the same from future debtors. If one rewards bad conduct, one should expect to see

more of it. This Court cannot run that risk by responding to the Debtor's depredations with no more than a Gallic shrug. Instead, the Court will send a different and more appropriate signal by converting this case to Chapter 7.

## CONCLUSION

For these reasons, the Court finds that conversion of the Debtor's case to Chapter 7 is in the best interests of creditors and the estate. As a result, the Debtor's case is converted to Chapter 7. A separate order will be entered consistent with this Opinion.

**ENTERED:**

DATE: JAN 2 8 2020

Donald R. Cassling SRR

**Donald R. Cassling**
**United States Bankruptcy Judge**